THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KAISER SAID ELMI, *et al.*,

                      Plaintiffs,

      v.

SSA MARINE, INC., *et al.*,

                      Defendants.

CASE NO. C13-1703-JCC

ORDER GRANTING IN PART AND DENYING IN PART SSA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on the motion for summary judgment filed by Defendants SSA Marine, Inc. and SSA Terminals, LLC ("SSA") and its employees John Bell, Tom Hsue, William Kendall, and Brandon Brent (collectively "SSA Defendants") (Dkt. No. 40). Having thoroughly considered the parties' briefing and the relevant record, the Court hereby GRANTS the motion in part and DENIES the motion in part for the reasons discussed below.

## I.    BACKGROUND

Plaintiffs Kaiser Said Elmi, Tesfarghabar Berhane, and Mohamed Muhiddin are all short-haul truck drivers of East African dissent who work at the Port of Seattle. Plaintiffs are self-employed and contract with various trucking companies that dispatch them. (Dkt. No. 73 at 6.) Plaintiffs and the trucking companies they contract with have no contractual relationship with SSA. (Dkt. No. 45 at 7.) As short-haul truck drivers, Plaintiffs' jobs are to pick-up and haul shipping containers "between terminals at the Port of Seattle and the rail yards" as well as other

nearby locations. (Dkt. No. 65 at 2.)

SSA operates a stevedoring business and leases land from the Port of Seattle for its operation. SSA's business involves the loading and unloading of vessels by longshore workers. (Dkt. No. 40 at 2.) SSA Defendants Bell, Hsue, Kendall, and Brent are or were foremen or superintendents employed by SSA.

The events giving rise to this lawsuit primarily occurred at Terminal 30, which SSA operates. Short-haul truck drivers receive their loads from various trucking companies and wait in line at Terminal 30 for their loads to be removed by longshoremen operating a mobile piece of machinery known as a picker.

On May 30, 2012 Plaintiff Elmi was waiting in line to drop off his load when a picker operated by Defendant Michael Cabbacang struck the chassis of his truck. (Dkt. No. 45 at 9.) It is disputed whether the act was intentional and whether the picker struck the chassis once or multiple times. (*Id.*; Dkt. No. 40 at 4.) Elmi got out of his truck to see what was happening and Cabbacang approached him while swearing and pushed and bumped Elmi with his chest. Elmi called the Port of Seattle Police Department ("POSPD") and Officer Jack Myers arrived at the scene. Officer Myers was unable to determine whether an assault had occurred and did not cite Cabbacang. (Dkt. No. 66, Ex. 1 at 3.) SSA Superintendent Hsue was called to the scene and banned Elmi from Terminal 30 for "life" for violating SSA's terminal rule against unauthorized foot traffic in Terminal 30 and for refusal to move his truck so that work could continue. (Dkt. No. 45 at 10; Dkt. No. 40 at 4.) SSA took no disciplinary action against Cabbacang.

On June 27, 2012 Plaintiff Berhane attempted to use the restroom at Terminal 30 while activity in the terminal ceased for a break period. (Dkt. No. 40 at 5.) Drivers had routinely used the restroom at Terminal 30 for years during break periods. (Dkt. No. 65 at 7.) Defendant Chad Rivers, a longshoreman employed by SSA, confronted Berhane and demanded that he not use the restroom. (Dkt. No. 40 at 5.) When Berhane entered the restroom to urinate, Rivers grabbed him by the neck and collar, choked Berhane, drug him from the restroom, and threw him to the floor

1   causing an injury to his shoulder and significant blood flow. Berhane called the POSPD to the

2   scene and Officer Walter Wesson responded. *Id.* Officer Wesson interviewed witnesses at the

3   scene and initiated an investigation which resulted in assault charges against Rivers for which he

4   was ultimately convicted. *Id.* In response to this incident, SSA Foreman John Bell placed sign

5   stating "Employees Only" on the restroom in an effort to institute a policy restricting restroom

6   use to longshoremen and SSA employees. (Dkt. No. 41 at 3.) It is unclear when the sign was

7   placed upon the door and whether Bell's policy was ever communicated to Plaintiffs. SSA took

8   no disciplinary actions against Rivers.

9           On September 25, 2012 Plaintiff Muhiddin attempted to use the restroom at Terminal 30

10  during a lunch break when he was confronted by Rivers. Rivers shoved Muhiddin saying "this is

11  a longshoreman's lunchroom." (Dkt. No. 45 at 12.) Muhiddin called the POSPD and Officer Jose

12  Santiago responded and was assisted by SSA employed Security Officer Terence Kwan. (Dkt.

13  No. 66, Ex. 4 at 1.) After Officer Santiago arrived, Defendant Brandon Brent, a SSA

14  superintendent, banned Muhiddin from Terminal 30 for seven days for violating SSA's rule

15  against walking across the terminal. (Dkt. No. 40 at 7.) After receiving the citation, Muhiddin

16  attempted to drop off his load before leaving Terminal 30 when he was cited for an additional

17  seven days for refusing to leave the terminal. It is disputed whether Brent or Bell issued the

18  citation for the additional seven days. (Dkt. No. 40 at 7; Dkt. No. 67, Ex. 12 at 17–19; Dkt. No.

19  67, Ex. 15 at 18–19.) Officer Santiago issued a citation to Rivers for an investigation of Assault

20  4. (Dkt. No. 66, Ex. 4 at 2.) No disciplinary actions were taken against Rivers by SSA.

21  **II.     DISCUSSION**

22          **A.      Standard for Summary Judgment**

23          "The court shall grant summary judgment if the movant shows that there is no genuine

24  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

25  Civ. P. 56(a). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return

26  a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1060

ORDER GRANTING IN PART AND DENYING IN
PART SSA DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
PAGE - 3

1   (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986)). The moving

2   party is entitled to judgment as a matter of law when the nonmoving party fails to make a

3   sufficient showing on an essential element of a claim in the case on which the nonmoving party

4   has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). The nonmoving

5   party must rely exclusively on admissible evidence to establish such specific facts in opposition

6   to the moving party's motion. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002). The

7   Plaintiff "must do more than simply show that there is some metaphysical doubt as to the

8   material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

9        **B.        Assault and Battery**

10       Plaintiffs claim that SSA Defendants were directly responsible for the alleged batteries

11  and assaults against them. (Dkt. No. 45 at 22–23.) Plaintiffs argue that SSA Defendants ratified

12  Cabaccang and Rivers' conduct by failing to supervise or discipline either, verbally supporting

13  the batteries, and using the violence to justify retaliation against Plaintiffs. *Id.* The parties dispute

14  two theories of liability for this claim: respondeat superior and negligent supervision. (*Id.*; Dkt.

15  No. 40 at 13.)

16       *1.        Respondeat Superior*

17       Employers may be held vicariously liable for the tortious acts of their employees when it

18  has been established that "the employee was acting in furtherance of the employer's business and

19  that he or she was acting within the course and scope of employment when the tortious act was

20  committed." *Thompson v. Everett Clinic*, 71 Wash. App. 548, 551 (1993). However "where an

21  employee commits an assault in order to effect a purpose of his or her own, the employer is not

22  liable." *Id.* at 551–552. A determination of "whether an employee's conduct is within the scope

23  of the employment is ordinarily for the jury, but certain fact patterns may, as a matter of law,

24  relieve the employer of liability." *Id.* Conduct may be within the scope of employment if "the

25  employee was, at the time, engaged in the performance of the duties required of him by his

26  contract of employment; *or* by specific direction of his employer; *or,* as sometimes stated,

ORDER GRANTING IN PART AND DENYING IN
PART SSA DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
PAGE - 4

1   *whether he was engaged at the time in the furtherance of the employer's interest.*" *Id.* at 552

2   (emphasis in original). If the tortious conduct was done solely to gratify the personal desires of

3   the employee, it cannot be fairly attributed to the employer. *Id.* at 553.

4         The central issue for this claim is whether Cabbacang and Rivers' alleged intentional

5   torts were conducted within the scope of employment. This case presents facts giving rise to a

6   genuine dispute over whether the alleged assaults were personally motivated or done in an effort

7   to enforce SSA's safety policies concerning unauthorized pedestrian traffic in Terminal 30 and

8   restrictions on access to the restroom facilities located in the terminal. If the alleged assaults

9   were conducted to enforce SSA's policies, this raises the further question of whether such

10  enforcement was conducted within the scope of employment.

11        Defendants argue that that Cabbacang and Rivers alleged assaults were conducted

12  "outside of the scope of employment as daily workers" and that the longshore workers were not

13  acting in furtherance of SSA's business because they were not tasked with enforcing SSA

14  terminal rules. (Dkt. No. 40 at 13–14; Dkt. No. 41 at 2.) There is some dispute over what SSA's

15  terminal rules were when the alleged assaults occurred. SSA's General Terminal Safety Rules

16  state, in relevant part, that: "Drivers must not get out of their vehicles when cargo handling

17  equipment, or other trucks are moving in the area." (Dkt. No. 41 at 15.) The rules further state

18  that:

19          No unauthorized pedestrian traffic is allowed on the terminal. Drivers

20          must stay close to their vehicles while in the yard and should be out of
            their    vehicle    only    for    actual    operating    needs,    e.g.

21          connecting/disconnecting chassis, locking/unlocking twistlocks.

22      *Id.* The rules as they are posted outside of Terminal 30 also state that: "No unauthorized

23  pedestrian traffic is allowed on the terminal." (Dkt. No. 41 at 14.) SSA Defendant John Bell

24  claimed that "[f]or safety reasons, SSA Terminals adopted and published a rule that prohibits all

25  individuals not directly involved in loading and unloading cargo ships from walking across

26  Terminal 30." (Dkt. No. 41 at 2.) The policy prohibiting unauthorized pedestrian foot traffic

ORDER GRANTING IN PART AND DENYING IN
PART SSA DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
PAGE - 5

1    conflicts with the permissive rule directing truckers not to get out of their vehicles when cargo

2    equipment is moving. In both Rivers' assault on Berhane and alleged assault on Muhiddin,

3    Plaintiffs attempted to use the bathroom during break periods when all activity in Terminal 30

4    had ceased. The conflict between these two rules is compounded by the fact that Plaintiffs

5    regularly used the restroom in Terminal 30 until Berhane was assaulted in June 2012. (Dkt. No.

6    45 at 10–11.) According to Berhane, he and other truckers had been using the restroom facilities

7    at Terminal 30 for years. (Dkt. No. 65 at 7). At the time of Rivers' assault on Berhane, truckers

8    were not restricted from using the restrooms at Terminal 30. (Dkt. No. 67, Ex. 13 at 8; Dkt. No.

9    40 at 5.) In response to the Berhane assault, Bell stated that he restricted access to the restrooms

10   to SSA employees and longshore workers by placing an "Employee's Only" sign on the restroom

11   door. (Dkt. No. 41 at 3). However, Bell never explained the new policy to the drivers or

12   informed the drivers that they were not employees within the meaning of the sign. (Dkt. No. Dkt.

13   No. 12 at 17, 21.)

14        In sum, SSA's policies relevant to this case are as follows: SSA had a rule which

15   categorically prohibited all unauthorized walking in the terminal; it also had a rule that applied

16   specifically to drivers, directing them to remain within their trucks only when loading machinery

17   was moving; prior to Berhane's assault SSA also had a longstanding practice of allowing

18   truckers to use the restrooms at Terminal 30; after Berhane's assault an unwritten restriction on

19   access to the restroom was effectuated by an "Employees Only" sign which was never explained

20   to Plaintiffs. Defendants state that "SSA had not restricted the use of that restroom at that time.

21   Berhane was not banned from the terminal." (Dkt. No. 40 at 5.) When asked whether the rule

22   against unauthorized pedestrian traffic was ever used to prevent drivers from using the bathroom

23   Bell stated that "[t]hat has always been a terminal rule that there's no walking in the terminal."

24   (Dkt. No. 67, Ex. 12 at 21.)

25        Plaintiff has produced facts sufficient to show that Rivers' assault on Berhane and alleged

26   assault against Muhiddin may have been done in an effort to enforce SSA's prohibition on

1   unauthorized foot traffic and Bell's restriction on bathroom access. Before Rivers assaulted

2   Berhane he claimed that the bathroom "was full of the road truck drivers and I asked them nicely

3   not to use the bathroom, and I stated that you Guys are not supposed to be out of the trucks."

4   (Dkt. No. 66, Ex. 3 at 11.) When Rivers allegedly assaulted Muhiddin he said that "[t]his is a

5   Longhsoreman's lunchroom" and allegedly pushed Muhiddin away from the rest room. (Dkt.

6   No. 45 at 12.) While Rivers was not charged with the enforcement of SSA's terminal rules, the

7   Court finds that there is a genuine issue of material fact as to whether the assaults were done in

8   furtherance of SSA's business and within the scope of employment. The Court therefore

9   concludes that denying summary judgment on this claim is appropriate.

10           **2.    *Negligent Supervision***

11           Plaintiffs also claim that SSA Defendants may be liable for the intentional torts of

12   Cabbacang and Rivers on the theory that they neglected their duty to supervise and adequately

13   deter their employees from assaulting Plaintiffs. (Dkt No. 45 at 22–23.) Unlike respondeat

14   superior, under negligent supervision, an employer may be liable for the conduct of an employee

15   that is outside of the scope of employment if "the employer knew, or in the exercise of

16   reasonable care, should have known the employee presented a risk of danger to others."

17   *Thompson v. Everett Clinic*, 71 Wash. App. 548, 555 (1993); *see also S.H.C. v. Lu*, 113 Wash.

18   App. 511, 517 (2002) ("Negligent supervision creates a limited duty to control an employee for

19   the protection of a third person, even when the employee is acting outside the scope of

20   employment."). If the employer had knowledge of the employee's dangerous tendencies, it may

21   be held liable for the employee's acts. *Thompson*, 71 Wash. App. at 555. Given that Rivers was

22   the assailant in both instances involving Berhane and Muhiddin, that the assaults may have been

23   done for similar reasons, took place close in time and in the same area, and that they were both

24   against drivers of East African descent, Plaintiff has produced facts sufficient to show a genuine

25   issue of material fact as to whether SSA Defendants either knew, or should have known that

26   Rivers posed a danger to others. The Court therefore concludes that summary judgment must

1  also be denied on these grounds.

2  **C.      42 U.S.C. § 1983**

3  Plaintiffs allege that SSA Defendants acted under color of state law to deprive Plaintiffs

4  of their constitutionally protected rights and that they are entitled to relief under 42 U.S.C. §

5  1983. (Dkt. No. 45 at 18–20.) Under the state action doctrine Plaintiffs argue that SSA

6  Defendants conspired with the Port of Seattle, or used their position as operators of the public

7  port to pass arbitrary rules used to discriminate against and penalize Plaintiffs on the basis of

8  their race and national origin. Plaintiffs also argue that SSA used the POSPD to victimize

9  Plaintiffs and to enforce SSA's discriminatory rules. (Dkt. No. 45 at 19–20.)

10  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by

11  the Constitution and laws of the United States, and must show that the alleged deprivation was

12  committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (U.S.

13  1988). SSA Defendants cannot be liable unless they conspired with or acted jointly with state

14  actors to deprive Plaintiffs of their constitutional rights. *See Radcliffe v. Rainbow Const. Co.*, 254

15  F.3d 772, 783 (9th Cir. 2001). To prove a conspiracy between SSA Defendants, the Port of

16  Seattle, and/or the POSPD, Plaintiffs must show that there was a meeting of the minds between

17  SSA Defendants and the state actors to violate Plaintiffs' constitutional rights and that they

18  shared common objectives of the conspiracy. *See Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir.

19  2002); *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th

20  Cir.1989).

21  The Ninth Circuit recognizes four tests for identifying state action, the satisfaction of any

22  test is sufficient to find state action notwithstanding countervailing factors. *Kirtley v. Rainey*, 326

23  F.3d 1088, 1092 (9th Cir. 2003). The tests used to identify state action are: "(1) public function;

24  (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus." *Sutton*

25  *v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835–36 (9th Cir. 1999). Plaintiffs appear to

26  assert their claim using the public function, joint action, and governmental nexus tests. (Dkt. No.

ORDER GRANTING IN PART AND DENYING IN
PART SSA DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
PAGE - 8

1    65 at 22–23.) The Court will discuss each test in turn.

2           *1.     Public Function*

3          "Under the public function test, when private individuals or groups are endowed by the

4    State with powers or functions governmental in nature, they become agencies or

5    instrumentalities of the State and subject to its constitutional limitations." *Lee v. Katz*, 276 F.3d

6    550, 554–55 (9th Cir. 2002) (internal quotations omitted). "To satisfy the public function test, the

7    function at issue must be both traditionally and exclusively governmental." *Id.* at 555.

8          Plaintiffs allege that SSA Defendants are "operating a traditional public facility,

9    performing the traditional function of international trade" in a discriminatory manner. (Dkt. No.

10   65 at 22.) SSA Defendants characterize their operation as a "private stevedoring business,

11   serving private vessels, in a limited number of marine terminals." (Dkt. No. 73 at 2.) Plaintiffs

12   produce no facts showing that the operation of a stevedoring business has been both traditionally

13   and exclusively a governmental function. Plaintiffs' conclusion that SSA Defendants engage in

14   international trade, and are therefore state actors, is unsupported by the record. While

15   stevedoring could arguably be characterized as a component of international trade, this Court

16   agrees with Defendants' contention that mere participation in international trade cannot, by itself,

17   constitute acting under color of state law. Otherwise the boundaries of § 1983 would be vastly

18   expanded.

19          *2.     Joint Action*

20         Under the joint action test, when a private party engages in a prohibited activity in

21   concert with state actors, the private party is acting under the color of state law. *See Lugar v.*

22   *Edmondson Oil Co.*, 457 U.S. 922, 941 (1982); *Florer v. Congregation Pidyon Shevuyim, N.A.*,

23   639 F.3d 916, 926 (9th Cir. 2011). Courts consider whether "the state has so far insinuated itself

24   into a position of interdependence with the private entity that it must be recognized as a joint

25   participant in the challenged activity. This occurs when the state knowingly accepts the benefits

26   derived from unconstitutional behavior." *Kirtley,* 326 F.3d at 1093 (quoting *Parks Sch. of Bus.,*

1   *Inc. v. Symington,* 51 F.3d 1480, 1486 (9th Cir.1995)). The Ninth Circuit requires a "substantial

2   degree of cooperation before imposing civil liability for actions by private individuals that

3   impinge on civil rights." *Franklin*, 312 F.3d at 445.

4        Plaintiffs present no evidence that the Port of Seattle was involved in the promulgation of

5   SSA's terminal rules, or in the enforcement of those rules. Further, Plaintiffs have not shown that

6   temporarily banning Elmi and Muhiddin from Terminal 30 was an unconstitutional activity that

7   the Port of Seattle somehow benefitted from. Plaintiffs' argument that SSA worked in concert

8   with the POSPD is unpersuasive: as SSA Defendants correctly noted, in each instance it was

9   Plaintiffs and not Defendants who called the police. Further, police filed charges on behalf of

10  Muhiddin and Berhane against Rivers for which he was ultimately convicted. The Court

11  concludes that Plaintiffs' claim that SSA Defendants conspired with the Port of Seattle and the

12  POSPD to deprive Plaintiffs of their constitutional rights is speculative and unsupported by the

13  record.

14       *3.    Governmental Nexus*

15       Under the governmental nexus test for a private party to act under color of state law there

16  must be "such a close nexus between the State and the challenged action that the seemingly

17  private behavior may be fairly treated as that of the State itself." *Kirtley*, 326 F.3d at 1095

18  (internal quotations omitted) (quoting *Brentwood Academy v. Tennessee Secondary Sch. Athletic*

19  *Ass'n.*, 531 U.S. 288, 295 (2001)). As discussed above, Plaintiffs have not shown that either the

20  Port of Seattle or the POSPD were sufficiently entwined with SSA Defendants' activity to form a

21  governmental nexus. The extent of the Port of Seattle's involvement presented in the record

22  includes their having leased the land that SSA operates its business upon. Similarly, Plaintiffs

23  allege that SSA Defendants used the POSPD to enforce their discriminatory policies but the

24  record reflects that Plaintiffs called the POSPD who then conducted interviews with the parties

25  involved in each incident, filed reports, and ultimately charged Rivers of assault. Plaintiffs have

26  not produced evidence indicating that there is a genuine dispute of material fact as to whether the

ORDER GRANTING IN PART AND DENYING IN
PART SSA DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
PAGE - 10

1   Port of Seattle or POSPD were so involved in SSA Defendants' activities to have formed a

2   governmental nexus.

3       Given that Plaintiffs' § 1983 claim cannot survive under any of the tests considered by

4   the Court, summary judgment dismissal is appropriate for this claim.

5       **D.    Racial/National Origin Discrimination Under Title VII**

6       Plaintiffs allege that SSA Defendants have implemented a racially discriminatory policy

7   with respect to usage of the restrooms at Terminal 30. (Dkt. No. 45 at 21.) As Defendants

8   correctly point out, Plaintiffs have not properly exhausted their administrative remedies under

9   Title VII and have produced no evidence to show that they first filed a charge with the Equal

10  Employment Opportunity Commission ("EEOC") before bringing this lawsuit. (Dkt. No. 40 at

11  13); *see also Blank v. Donovan*, 780 F.2d 808, 809 (9th Cir. 1986) (holding that the plaintiff

12  must first exhaust administrative remedies with the EEOC under Title VII). Title VII requires

13  that a plaintiff shall file a charge "within one hundred and eighty days after the alleged unlawful

14  employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). Accordingly, this Court concludes

15  that granting summary judgment on this claim is appropriate.

16      **E.    Intentional Infliction of Emotional Distress (IIED)**

17      Plaintiffs also bring an IIED claim, alleging that SSA Defendants intended to cause

18  severe emotional distress through violence, intimidations, economic deprivation, and by carrying

19  out their discriminatory policies. (Dkt. No. 45 at 24.) To prevail on a claim of IIED, a plaintiff

20  must prove three elements: "(1) extreme and outrageous conduct, (2) intentional or reckless

21  infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress."

22  *Kloepfel v. Bokor*, 149 Wash. 2d. 192, 195 (2003). Further, the conduct must be "so outrageous

23  in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

24  regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 196. IIED does not

25  include "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. In

26  this area plaintiffs must necessarily be hardened to a certain degree of rough language,

1  unkindness and lack of consideration." *Id.* (quoting *Grimsby v. Samson*, 85 Wash. 2d 52, 59

2  (1975)) (citation and internal quotations omitted).

3      SSA Defendants' conduct consisted of banning Elmi and Muhiddin from accessing

4  Terminal 30 for varying lengths of time following each incident. After Cabbacang allegedly

5  assaulted Elmi on May 30, 2012, SSA Foreman William Kendall banned Elmi from Terminal 30

6  for "life." (Dkt. No. 45 at 10.) Elmi was allowed to return to Terminal 30 in December 2014.

7  (Dkt. No. 67, Ex. 14 at 22.) SSA Superintendent, Defendant Brandon Brent, banned Muhiddin

8  from Terminal 30 for seven days for walking across the terminal in violation of SSA's rules, and

9  either Bell or Brent sanctioned Muhiddin for an additional seven days for attempting to drop off

10  his container immediately after the first citation was issued. (Dkt. No. 40 at 7; Dkt. No. 67, Ex.

11  15 at 18–19.) Muhiddin returned to work shortly after the two week ban period.

12      Banning Elmi and Muhiddin from accessing Terminal 30 falls short of satisfying IIED's

13  first requirement that the conduct be extreme and outrageous as to be utterly intolerable in a

14  civilized community. SSA Defendants' bans in themselves were not extreme and outrageous, and

15  the severe emotional distress that Plaintiffs claim stems from Cabbacang and Rivers' alleged

16  assaults. As previously discussed, however, there is a genuine dispute of material fact as to

17  whether Cabbacang and Rivers were acting within the scope of employment, and in turn whether

18  SSA Defendants may be held vicariously liable for their intentional torts. Under the doctrine of

19  respondeat superior, and employer may be liable for the intentional torts of its employees and

20  IIED is within the ambit of this rule.

21      Plaintiffs have produced facts sufficient to show that Cabbacang and Rivers' Conduct

22  may have intentionally or recklessly inflicted emotional distress and that Plaintiffs suffered

23  actual severe distress. It is disputed whether Cabbacang struck Elmi's chassis with the picker

24  intentionally and how many times. Elmi stated that the picker struck the chassis so hard that the

25  truck nearly tipped over. (Dkt. No. 65 at 6.) Plaintiffs allege that after striking the chassis with

26  the picker, Cabbacang bumped his chest into Elmi's and screamed "You Mother Fucker, you

1    don't belong here." (Dkt. No. 45 at 9–10.) As a result, Hsu banned Elmi from the terminal for

2    "life" and Cabbacang was not cited. (Dkt. No. 40 at 4; Dkt. No. 45 at 10.) Afterwards Elmi

3    claimed that he could not sleep, suffered from nightmares and flashbacks, and was very stressed

4    for more than a year. (Dkt. No. 16, Ex. 14 at 12, 26, 28–29.)

5            Berhane was physically and verbally assaulted by Rivers while attempting to urinate in

6    the restroom in Terminal 30. Rivers grabbed Berhane by the neck and collar, choking him, and

7    proceeded to drag him from the restroom and throw Berhane to the floor. (Dkt. No. 45 at 10–11.)

8    Berhane sought medical attention for a bloody injury to his arm and was diagnosed with a

9    contusion on his right shoulder. (Dkt. No. 67, Ex. 13 at 16.) As a result of the assault Berhane

10   received psychological treatment from a counselor. (Dkt. No. 67, Ex. 13 at 13–14.) Berhane

11   claims that he had nightmares, headaches, lost face before his family, and has never fully

12   recovered. (Dkt. No. 67, Ex. 13 at 21.) Berhane also stated that he was so afraid because of what

13   had happened that once he returned to Terminal 30 he resorted to urinating into a bottle in his

14   truck. (Dkt. No. 67, Ex. 13 at 22–23.)

15           The Court concludes that there is a genuine dispute of material facts as to whether there

16   was outrageous conduct and whether SSA Defendants ratified the conduct of Cabbacang and

17   Rivers.

18           **F.      Racial/National Origin Discrimination Under RCW 49.60.030**

19           Plaintiffs bring their disparate treatment claim of race and national origin discrimination

20   under the Washington law Against Discrimination ("WLAD") which provides for the rights to

21   "obtain and hold employment without discrimination" and to the "enjoyment of any of the

22   accommodations, advantages, facilities, or privileges of any place of public resort,

23   accommodation, assemblage, or amusement." RCW 49.60.030(1)(a)–(b). Plaintiffs contend that

24   the WLAD protects the rights of independent contracts in addition to employees and that they are

25   therefore entitled to relief. (Dkt. No. 65 at 32–33.) To establish a prima facie case of employment

26   discrimination alleging disparate treatment under the WLAD the plaintiff must show that: "(1)

ORDER GRANTING IN PART AND DENYING IN
PART SSA DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
PAGE - 13

1   the employee is a member of a protected class, (2) the employee is qualified for the employment

2   position or performing substantially equal work, (3) the employee suffered an adverse

3   employment action, and (4) similarly situated employees not in plaintiff's protected class

4   received more favorable treatment. *Matson v. United Parcel Serv., Inc.*, 872 F. Supp. 2d 1131,

5   1137 (W.D. Wash. 2012). The Washington Supreme Court held that RCW 49.60.030 provides

6   broad protection and that an "independent contractor may bring an action for discrimination in

7   the making or performance of a contract for personal services where the alleged discrimination is

8   based on sex, race, creed, color, national origin or disability." *Marquis v. City of Spokane*, 130

9   Wash. 2d 97, 100–01 (1996).

10        Both parties agree that the WLAD safeguards the rights of independent contractors to be

11   free from discrimination, however, SSA Defendants contend that Plaintiffs are not independent

12   contractors with them:

13            [P]laintiffs are not independent contractors for SSA. They do not
             have contracts with SSA; and they are not paid by SSA. Rather, the
14            self-employed plaintiffs contract with a trucking company who
             dispatches them . . . . Thus, SSA has no contractual relationship
15            whatsoever with either the plaintiff truck drivers or the trucking
             companies with whom the plaintiffs contract.
16
17   (Dkt. No. 73 at 6.) Plaintiffs concede that they are not independent contractors with SSA.

18   (Dkt. No. 65 at 3.) Given the absence of any employment or contractual relationship between the

19   parties, Plaintiffs do not fall within the protected classes under the WLAD.

20        The elements for discrimination in public accommodations under the WLAD are similar

21   to the ones used for employment discrimination. A plaintiff must show that: "(1) he is a member

22   of a protected class; (2) the defendant's establishment is a place of public accommodation; (3) the

23   defendant discriminated against plaintiff by not treating him in a manner comparable to the

24   treatment it provides to persons outside that class; and (4) the protected status was a substantial

25   factor causing the discrimination." *Ross v. Snohomish Cnty.*, No. C13-1467-JLR, 2014 WL

26   1320125, at *7 (W.D. Wash. Mar. 28, 2014) (citing *Demelash v. Ross Stores*, *Inc.,* 105 Wash.

ORDER GRANTING IN PART AND DENYING IN
PART SSA DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
PAGE - 14

1    App. 508 (Wash. Ct. App. 2001)). SSA operates Terminal 30 as a private business, does not offer

2    any services to the public, and has the right to limit who enters the premises. (Dkt. No. 41 at 2.)

3    Plaintiffs have not produced facts indicating that there is a genuine issue of material fact as to

4    whether Terminal 30 is a public accommodation. For this reason, the Court grants summary

5    judgment to SSA Defendants.

6          **G.     Negligence**

7          Plaintiffs allege that they were business invitees of SSA to whom SSA Defendants owed

8    a duty of care that was breached by failing to protect Plaintiffs from foreseeable threats of harm,

9    including criminal violence. (Dkt. No. 65 at 33–34.)

10         As a threshold matter the Court must determine whether Plaintiffs were business invitees.

11   "A business [invitee] is [one] who is invited to enter or remain on land for [the] purpose directly

12   or indirectly connected with business dealings with the possessor of the land." *Fuentes v. Port of*

13   *Seattle*, 119 Wash. App. 864, 869 (2003) (internal quotations omitted). While Plaintiffs are not

14   independent contractors with SSA Defendants, the service they provide is integral to SSA's

15   operation and it is undisputed that SSA benefits from their dealings with the truck drivers. SSA

16   Defendants argue that when Plaintiffs walked across Terminal 30 or attempted to use the

17   restroom, that they were in violation of SSA terminal rules and exceeded the scope of their

18   invitation. (Dkt. No. 73 at 7.) The Court finds, however, that given SSA's longstanding policy of

19   allowing drivers to use the restrooms, and the ambiguity of the "Employees Only" sign posted

20   after Rivers' assault on Berhane, that there is a genuine dispute of material fact as to whether

21   Plaintiffs exceeded the scope of their invitation. Accordingly, the Court finds that Plaintiffs have

22   produced sufficient facts to show a genuine issue of material fact as to whether Plaintiffs were

23   SSA's business invitees.

24         Now the Court must determine whether there is a genuine issue of material fact as to

25   whether SSA Defendants breached their duty to Plaintiffs as business invitees and whether the

26   harm Plaintiffs suffered was reasonably foreseeable. "It is the special relationship between a

1   business and its business invitee that under Washington law may lead to the duty to protect the

2   invitee from the criminal acts of third persons." *McKown v. Simon Prop. Grp., Inc.*, 344 P.3d

3   661, 666 (Wash. 2015). "In order to establish a genuine issue of material fact concerning a

4   landowner's obligation to protect business invitees from third party criminal conduct under the

5   prior similar incidents test, a plaintiff must generally show a history of prior similar incidents on

6   the business premises within the prior experience of the possessor of the land." *McKown v.*

7   *Simon Prop. Grp., Inc.*, 344 P.3d 661, 669 (Wash. 2015). "The prior acts of violence on the

8   business premises must have been sufficiently similar in nature and location to the criminal act

9   that injured the plaintiff, sufficiently close in time to the act in question, and sufficiently

10   numerous to have put the business on notice that such an act was likely to occur." *Id.* at 662.

11        As the Court noted above in its discussion of negligent supervision, Plaintiffs have made

12   a strong case that Rivers' alleged assault on Muhiddin was reasonably foreseeable to SSA

13   Defendants. The similarities between Rivers' assault on Berhane and his subsequent alleged

14   assault on Muhiddin, create a genuine issue of material fact under the similar incidents test as to

15   whether Rivers' assault on Muhiddin was reasonably foreseeable. As previously stated, both the

16   first assault and the alleged second assault were perpetrated by Rivers, both were against truck

17   drivers of East African dissent, both happened in or near the restroom at Terminal 30, both may

18   have been done as part of an effort to enforce SSA terminal rules, and both took place between

19   June and September of 2012. Accordingly, the Court concludes that Plaintiffs have raised a

20   genuine issue of material fact as to whether SSA Defendants met their duty of care to Plaintiffs.

21        **G.    Motion to Strike**

22        Pursuant to Local Rule 7(g), SSA Defendants filed a motion to strike included within

23   their reply in support of the motion for summary judgment. (Dkt. No. 73.) Defendants move this

24   Court to strike several of Plaintiffs' exhibits and claims made within their reply to the motion for

25   summary judgment. This Court denies the motion to strike as moot, given that the Court did not

26   rely upon the evidence at issue with the exception of the challenged exhibits at Dkt. No. 73:8 21–

23. With respect to the statements of police officers based on their personal observations contained within police reports that the Court considered, those documents are relevant, fall within an exception to hearsay, and are admissible as public records under Federal Rule of Evidence 803(8)(ii)–(iii). The Court also considered Rivers' written and signed statement (Dkt. No. 66, Ex. 3 at 11) and concludes that it is admissible as an opposing party statement under Rule 801(2). SSA Defendants' motion to strike is therefore DENIED.

## III.    CONCLUSION

For the foregoing reasons, SSA Defendants' motion for summary judgment (Dkt. No. 40) is GRANTED with respect to Plaintiffs § 1983 claims against SSA Defendants and Plaintiffs' racial and national origin discrimination claims in violation of Title VII and RCW 49.60.030. The Court hereby ORDERS that those claims are DISMISSED. SSA Defendants' motion is DENIED in part with respect to Plaintiffs' assault and battery, IIED, and negligence claims. SSA Defendants' motion to strike (Dkt. No. 73) is DENIED.

DATED this 18th day of May 2015.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER GRANTING IN PART AND DENYING IN
PART SSA DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT
PAGE - 17